# EXHIBIT C

**GWENDOLYN RAY**
29 N. Monastery Avenue
Baltimore, Maryland 21229

   *Plaintiff*

v.

**JAMES B. NUTTER & CO.**
4153 Broadway
Kansas City, Missouri 64111

   **SERVE ON:**
   **RESIDENT AGENT**
   CSC Lawyers Inc. Service Co.
   7 St. Paul Street
   Suite 820
   Baltimore, MD 21202

AND

**SPENCER T. VAUGHAN**
3108 Nestling Pine Court
Ellicott City, Maryland 21042

AND

**REVERSE MORTGAGE FUNDING,
LLC**
1455 Broad Street, 2nd Floor
Bloomfield, New Jersey 07003

   **SERVE ON:**
   **RESIDENT AGENT**
   Corporate Creations Network, Inc.
   2 Wisconsin Circle, #700
   Chevy Chase, MD 20815

   *Defendants.*

**IN THE**

**CIRCUIT COURT**

**OF MARYLAND**

**FOR**

**BALTIMORE CITY**

**CASE No.: _____**

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Gwendolyn Ray, by and through her undersigned attorney, Kathleen P. Hyland and Hyland Law Firm, LLC, hereby files this Complaint against James B. Nutter & Co. ("JBN"), Spencer T. Vaughan ("Vaughan"), and Reverse Mortgage Funding, LLC ("RMF"), and states as follows:

## **INTRODUCTION**

1.    Baltimore is a city of neighborhoods, in which home values have historically fluctuated wildly, even within many of the same census tracts. For decades, due to the extreme disparities in housing types and values, Baltimore's homeowners have been vulnerable to market manipulation by lenders and appraisers who seek financial gain with little or no regard to the homeowners' stability, security, family wealth, or neighborhood preservation. This case demonstrates how one vulnerable family was taken advantage of by a reverse mortgage lender and its agents and assignees, who have left two elderly lifelong city residents teetering on the edge of imminent homelessness.

2.    This matter arose when the Plaintiff's late mother obtained a reverse mortgage from Defendant James B. Nutter & Co. for an amount that well-exceeded the value of her home, in contravention of federal guidelines, and during the economic recession of 2009 when Baltimore City experienced a nadir of home values. When Plaintiff's mother passed away, her heirs entered into a contract to sell the home for ninety-five percent of the appraised value to a buyer who agreed to rent it back to them.

2

3. Rather than properly process the sales contract, the lender inexplicably delayed, did not apply for an extension, and then had the home re-appraised for double the initial value. The second appraisal used entirely different, incomparable properties that all contained more bedrooms than the subject property. The appraisal also added an extra bedroom to the subject property. The drastic change in price caused the Plaintiff's potential sale to fall through.

4. Following the new appraisal, the lender sold the alleged debt along with other area mortgages it originated during the same time period of the economic recession for suspiciously high values to a new lender, Co-Defendant Reverse Mortgage Funding, LLC. After acquiring the inflated and badly-serviced reverse mortgage, RMF sent numerous collection letters demanding the full balance of the loan, refused to provide any other loss mitigation options, and instituted a foreclosure action against the Property.

5. When faced with the foreclosure action, Plaintiff embarked on a year-long crusade to exhaust any and all available options for home retention because she and the co-occupant, her elderly uncle, have the income to cover a monthly mortgage payment. Even though Plaintiff invested in repairs and fixed up the house to appeal to new lenders, and in spite of the fact that the housing market had marginally improved, no lender would estimate the property value to be anywhere near JBN's second appraisal by Defendant Spencer T. Vaughan and their application was denied. Plaintiff then submitted a short-sale application to RMF.

3

In response, RMF demanded more money from the potential buyer in excess of the appraised amount, and rejected the short sale.

6.      JBN orchestrated a scheme to encumber the Property with inflated debt, and then profited by selling this toxic loan to RMF at a value that likely exceeded what it would recover from Plaintiff. This deprived Plaintiff of her rights to remain in the property as an heir. But for JBN's failure to follow FHA guidelines and approve her initial contract, compounded with the bogus appraisal, Plaintiff would not be the subject of a foreclosure action, debt collection attempts, and poised to lose her family home. RMF, as holder of the toxic debt, lacked the right to demand the inflated amounts and institute a foreclosure action against Plaintiff.

7.      Plaintiff files this action to seek redress for the Defendants' violations of Maryland consumer protection laws and Negligence, and for any other relief this Court deems fit.

## PARTIES

8.      Plaintiff Gwendolyn Ray ("Ray") is a consumer who inherited her family home and principal residence at 29 N. Monastery Avenue, Baltimore, MD 21229 (the "Property"). Plaintiff is retired from employment with the federal government.

9.      Defendant James B. Nutter & Co., ("JBN") is a mortgage lender licensed to do business with the Maryland State Department of Labor and is registered with the Maryland State Department of Assessments and Taxation.

4

10.     Defendant Spencer T. Vaughan is a Maryland certified residential real estate appraiser who is licensed as an individual with the Maryland Department of Labor.

11.     Defendant Reverse Mortgage Funding, LLC is a mortgage lender licensed to do business with the Maryland State Department of Labor and is registered with the Maryland State Department of Assessments and Taxation.

## JURISDICTION AND VENUE

12.     The Circuit Court has exclusive original subject matter jurisdiction over the claims asserted herein because the Plaintiff seeks in excess of $30,000 in damages and has exercised his right to a trial by jury.

13.     The Circuit Court can exercise personal jurisdiction over the Defendants.  Defendants regularly conduct business in Maryland.  The cause of action for this dispute arose in Baltimore City.

14.     This Court has jurisdiction and venue of all causes of actions alleged herein, as the claims for relief accrued in Maryland; Defendant Vaughan resides in Maryland and conducts business in Baltimore City; and Defendants regularly transact business, perform work, provide services, and Defendants JBN and RMF have interests in real property, in Maryland and Baltimore City, Maryland.

15.     This Court also has jurisdiction for the claims asserted because the injuries proximately caused by the Defendants occurred in Maryland and Baltimore City.

5

## FACTUAL ALLEGATIONS

### A. Background

16.    On August 1, 2009, Plaintiff's late mother, Mary L. Isaac, entered into a promissory note secured by a Deed of Trust with JBN.

17.    The underlying transaction between Ms. Isaac and JBN was an Adjustable Rate Note for a Federal Housing Administration ("FHA") Home Equity Conversion Mortgage or "HECM", which was a reverse mortgage under which Ms. Isaac could borrow up to $150,000.00 (also referred to herein as the "Isaac Loan").

18.    The Isaac Loan was insured by the Federal Housing Administration ("FHA").

19.    The transaction was secured by Ms. Isaac's principal residence at 29 N. Monastery Avenue, Baltimore, MD 21229.

20.    On September 25, 2020, the United States Department of Justice filed a False Claims Action against Defendant JBN, alleging among other things that it issue consumers reverse mortgages at values that exceeded the actual appraised value of their homes. United States District Court for the District of Columbia, Case No. 1:20-cv-02742-TJK (consolidated in the U.S. District Court for the Western District of Missouri, Case No. 4:20-cv-00874-RK). That matter is ongoing as of the date of this filing.

21.    Upon information and belief, Defendant JBN knew or had reason to know of the USDOJ Action prior to April of 2018, due to related litigation filed in federal court in New York.

6

22.     Ms. Isaac passed away on November 18, 2017. Upon her death, the Property transferred to Ms. Ray as a remainderman.

23.     When Ms. Isaac died, the principal balance allegedly owed on the reverse mortgage was approximately $93,232.89.

24.     Under the terms of the reverse mortgage, Ms. Isaac's death constituted a default.

25.     According to FHA guidelines, Ms. Isaac's death triggered certain rights to the Plaintiff as her heir, including the right to satisfy any obligations owed to JBN by selling the property for ninety-five percent (95%) of the appraised value.

26.     According to FHA Guidelines:

> The estate or heirs may need to sell the home to repay the HECM loan. If the loan balance is more than the home is worth, the estate or heirs may sell the property for at least 95-percent of the current appraised value and the lender will accept the net proceeds as satisfaction of the loan. The lender may approve 90-day extensions with satisfactory documentation that the estate or heir is actively trying to sell the property or repay the loan. The lender will obtain the required appraisal to determine the value of the property.

Source: "What you need to know if you inherit a home that is security for an FHA Home Equity Conversion Mortgage (HECM)" Federal Housing Administration, Office of Single Family Housing, https://www.hud.gov/sites/dfiles/SFH/ documents/sfh_hecm_inherit_security.pdf (last accessed April 23, 2021).

27.     In or about December of 2017, Plaintiff obtained an extension from JBN to sell the Property through March 22, 2018.

7

28.     On December 8, 2017, JBN had the Property appraised by 20/20 Valuations, LLC. JBN then advised Ms. Ray that the appraised value was $33,000 and the sale price for the Property was $31,350. ("First Appraisal"). *See* **Exhibit A, Excerpt from First Appraisal.**

29.     Ms. Ray retained a real estate attorney, Eileen Carpenter, Esq., who prepared the contract documents for the sale and communicated with JBN.

30.     Ms. Carpenter also prepared and submitted the title work necessary for Ms. Ray to convey the Property as the legal successor-in-interest. This officially changed title from the deceased to Ms. Ray's name.

31.     In early March of 2018, Ms. Carpenter contacted JBN and was advised by Ms. April McGee, the contact person at JBN, that there was no rush to close. Ms. McGee advised Ms. Carpenter that a new servicer was taking over the Property but that had been rescheduled for several months hence. Ms. Carpenter sent Ms. McGee an email confirming that they no longer had a deadline to close by March 22, 2018 and that they could close on or before April 15, 2018.

32.     On or about April 4, 2018, Ms. McGee contacted Ms. Carpenter and advised that the appraisal was going to expire over the weekend and she needed certain documentation from Ms. Carpenter by Friday, April 6, 2018 so she could request an extension of the appraisal.

33.     On the morning of April 6, 2018, Ms. Carpenter emailed Ms. McGee the requested documents. These consisted of a fully executed sales contract between Ms. Ray and Mr. Kevin Ennals, dated April 5, 2018, for the required sales

8

price of $31,350. Ms. Carpenter also called Ms. McGee to confirm receipt, but was told that Ms. McGee was not at the office. *See* **Exhibit B, Sales Contract**.

34.    According to the FHA Single Family Housing Policy Handbook, HUD 4000.1, which contains the applicable loan regulations for this transaction:

> The 120 Day validity period for an appraisal (see *Ordering Appraisals*) may be extended for 30 Days at the option of the Mortgagee if (1) the Mortgagee approved the Borrower or HUD issued the Firm Commitment before the expiration of the original appraisal; or **(2) the Borrower signed a valid sales contract prior to the expiration date of the appraisal.**

*See FHA Single Family Housing Policy Handbook*, "Appraisal Validity," p. 111, https://www.allregs.com/tpl/Base/ViewBinaryContent?contentId=6ce8aff4-5a7e-415d-a5f0-477e56f70913&mimeTypeId=5, (last accessed, April 23, 2021). Emphasis added.

35.    The Plaintiff had signed and submitted a valid sales contract prior to the expiration date of the appraisal, and therefore qualified for the 30-day extension.

36.    The sales contract was for an arms-length transaction in which the buyer, Kevin Ennals, had agreed to rent the Property back to Ms. Ray. Thus, the transaction would have enabled Ms. Ray and Lewis Ray to retain their home and avoid dislocation and homelessness.

37.    Ms. Carpenter called again on Monday, April 9, 2018. Ms. McGee advised that she had received the documents, but had not requested the extension.

9

38.     According to Ms. McGee, she allegedly requested an extension after the deadline had passed. The alleged extension request was denied because the appraisal had already expired.

**B. The Inaccurate Second Appraisal**

39.     On April 23, 2018, JBN had another appraisal performed on the Property. ("Second Appraisal"). *See* **Exhibit C, Excerpt from Second Appraisal.**

40.     The Second Appraisal was performed by Defendant Spencer T. Vaughan.

41.     According to the Appraiser's Report of April 25, 2018, Mr. Vaughan appraised the Property at $60,000.

42.     Unlike the First Appraisal, the Second Appraisal contained the following differences:

> a. It characterized the subject Property as a 3-Bedroom Home, rather than a 2-Bedroom Home, which the First Appraisal had determined the Property to be.
>
> b. It used comparable sales data exclusively 4- and 3-Bedroom Homes, rather than any 2-Bedroom Homes.
>
> c. It added a note that "IT IS NOT UNCOMMON FOR THE SITE VALUE TO EXCEED 30%+ OF THE FINAL ESTIMATE OF VALUE."

10

43.    According to the Baltimore City Code, which incorporates the International Residential Code, the Property is a two-bedroom residence. It contains a pass-through room with no separate egress or street access, and no window. This was mischaracterized as a third bedroom and used to justify a higher appraised value.

44.    Residential real estate records from the relevant appraisal time period demonstrates that comparable estimates from two-bedroom houses were not used. This includes, but is not limited to:

> a. 157 Monastery Avenue, Baltimore, MD 21229 sold on February 9, 2018 for $30,305. MRIS #BA10047068.

> b. 3608 Lexington Street, Baltimore, MD 21229 sold on November 10, 2017 for $40,000. MRIS #BA10030972.

45.    Following the Second Appraisal, Ms. Ray and Ms. Carpenter appealed the price difference.

46.    Mr. Vaughan dismissed their concerns and assured that he is never wrong on appraisals.

47.    Following receipt of the Second Appraiser's Report after April 25, 2018, JBN proceeded with the Second Appraisal and changed the required sale price to $57,000.

48.    Upon information and belief, JBN did not follow *FHA Single Family Housing Policy Handbook* regulations for disputes related to use of non-comparable properties.

11

49.    Upon information and belief, JBN and Vaughan did not comply with the federal Truth-in-Lending Act, 15 U.S. Code § 1639, *et seq.* by misrepresenting the appraised value of the Property.

50.    The potential buyer, Mr. Ennals, could not afford the difference between the two prices, and Ms. Ray was not able to go forward with her sale to Mr. Ennals.

51.    On October 24, 2019, Ms. Ray paid for a new HUD-Certified Appraisal from Powers Appraising, LLC. ("Third Appraisal").

52.    The Third Appraisal concluded that the Property is a two-bedroom house and valued the Property at $45,400.

53.    The Third Appraisal stated, "the den in between the 2 bedrooms is a pass through room which does not have a window for egress."

54.    Following the Third Appraisal, Ms. Ray was denied financing because a potential lender believed the Property needed many repairs.

55.    Ms. Ray immediately performed a list of repairs to improve her chances of qualifying for financing.

56.    In addition, the fact that Ms. Ray became the title owner to enter into the sales contract with Mr. Ennals rendered her ineligible for any first-time homebuyer programs in Maryland. This also made qualifying for financing more difficult.

57.    In or about December of 2018, Defendant JBN sold the Isaac Loan, along with several other mortgages, to Defendant RMF.

## C. **Defendant RMF's Illegal Collection Attempts**

58.     On October 5, 2018, RMF sent Ray a Monthly Reverse Mortgage Statement demanding $101,250.67 due and payable on the Isaac Loan.

59.     On October 24, 2018, RMF sent Ray a Mortgage Due and Payable Notification, demanding $102,290.26 due and payable on the Isaac Loan.

60.     On January 7, 2019, RMF sent Ray an Annual Reverse Mortgage Statement demanding $103,676.80 due and payable on the Isaac Loan.

61.     On April 5, 2019, RMF sent Ray a Monthly Reverse Mortgage Statement demanding $104,694.46 due and payable on the Isaac Loan.

62.     On May 7, 2019, RMF sent Ray a Monthly Reverse Mortgage Statement demanding $105,273.36 due and payable on the Isaac Loan.

63.     On June 6, 2019, RMF sent Ray a Monthly Reverse Mortgage Statement demanding $105,856.23 due and payable on the Isaac Loan.

64.     On December 6, 2019, RMF sent Ray a Monthly Reverse Mortgage Statement demanding $110,773.20 due and payable on the Isaac Loan.

65.     On March 13, 2019, Reverse Mortgage, through its agents and attorneys, caused a Notice of Intent to Foreclose to be sent to Ms. Ray.

66.     The NOI stated that "the total amount required to cure default as of the date of this notice" was $105,944.46.

67.     On June 19, 2019 date, the Substitute Trustees filed a foreclosure action in the Circuit Court for Baltimore City, Case No. 24-O-19-001004.

13

68.   In the foreclosure action, RMF, through its attorneys, filed an affidavit claiming that the purported balance owed was $107,106.23.

69.   Ms. Ray elected her right to mediation. On October 17, 2019, Ms. Ray attended mediation with RMF and the Substitute Trustees.

70.   Ms. Ray was not offered any loss mitigation options.

71.   Ms. Ray also provided RMF with a hardship letter in which she explained in detail what had happened with the appraisals, and how she believed JBN had proceeded with an incorrect appraisal.

72.   RMF did not respond. It therefore knew of the issues with the appraisals, but continued to litigate the foreclosure action.

73.   Ms. Ray immediately began an application with the Sun Program through Blue Hub Capital, which finances homeowners in foreclosure.

74.   On January 3, 2020, the Court granted Ms. Ray's motion to stay the foreclosure case.

75.   Ms. Ray also worked with local area housing counselors to qualify Lewis Ray for a mortgage. While Mr. Ray had an acceptable credit score and income, his lack of credit history rendered him ineligible for financing.

76.   The Sun Program denied Ms. Ray for financing, and explained, in part, that the Property did not have the equity necessary to qualify for the program.

77.   In fact, on February 19, 2020, the Sun Program sent its own appraiser, who valued the Property at $43,000.

14

78.     On February 11, 2021, Ms. Ray submitted a Short Sale Application including a sales contract for Mr. Ennals to purchase the Property at $45,400, the higher of the two recent appraisals.

79.     RMF responded to demand that Ms. Ray cover all costs associated with the sale, for a total purchase price of $54,143.50.

80.     While Ms. Ray and Mr. Ennals scrambled to save money and obtain proof of income for that amount, RMF denied the Short Sale Application.

81.     On April 14, 2020, Ms. Ray and Mr. Ennals resubmitted a short sale packet for the inflated price of $54,143.50.

82.     To date, Ms. Ray is current on her homeowner's insurance and taxes, and has made all required escrow payments into the Court.

83.     Due to the stress of trying to save her family home, Ms. Ray has been hospitalized for a severe panic attack, an asthma attack, and has developed a hernia from stress. She has also experienced sleeplessness, changes in appetite, mood changes, headaches, and digestive problems.

84.     RMF continues to pursue the foreclosure action for the toxic, illegally serviced debt.

85.     As a result of JBN's fraudulent and deceptive actions, Ray has suffered the following damages:

      a.  Loss of funds to repair her home;

      b.  Loss of funds to cover realtor fees and appraisal fees;

      c.  Loss of funds paid into the Court escrow;

d. Extreme stress with a physical manifestation due to the ongoing foreclosure action;

e. Loss of resources to make other financial decisions;

f. Financial pressure and distress;

g. Distrust for financial professionals;

h. Embarrassment and inconvenience;

i. Attorney's fees.

## COUNT ONE
### VIOLATIONS OF THE MD. CONSUMER PROTECTION ACT
### Md. Code Ann., Com. Law § 13-101, *et seq.*
### (AGAINST ALL DEFENDANTS)

86.     The Plaintiff incorporates by reference the foregoing allegations of this Complaint.

87.     The Plaintiff is a "consumer" as defined in § 13-101 (c) of the Maryland Consumer Protection Act ("MCPA").

88.     The Defendants are subject to all of the consumer protections mandated by the MCPA which, among other things, prohibits unfair or deceptive practices in the extension of consumer debt and the sale of consumer services. MCPA, Com. Law §§ 13-303(1).

89.     Unfair or deceptive trade practices include any failure to state material facts and representations that consumer services are of a particular standard or quality which they are not. MCPA, Com. Law §§ 13-301(3) and §§ 13-301(2)(iv).

16

90. Unfair or deceptive trade practices include any false, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers. MCPA, Com. Law §§ 13-301(1).

91. Defendants violated the foregoing provisions of the MCPA by making oral misrepresentations and untrue written statements about the quality of the toxic mortgage.

92. Defendant JBN further violated the foregoing provisions of the MCPA by making false and deceptive statements about the Property.

93. Defendant Vaughan further violated the foregoing provisions of the MCPA by making false and deceptive statements about the Property.

94. Defendants JBN and RMF further violated the foregoing provisions by attempting to collect a toxic debt, in contravention of the MCDCA.

95. The Plaintiff reasonably relied on the Defendant's written and oral statements to her detriment.

96. The Plaintiff suffered actual damages as a direct result of her reliance, including emotional distress and loss of use of her money.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor, against Defendant for actual damages in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00), attorney's fees, interest and costs, and grant Plaintiff such other relief as the Court deems proper.

17

## COUNT TWO
### NEGLIGENCE
### (AGAINST DEFENDANTS JBN AND VAUGHAN)

97. The Plaintiff incorporates by reference the foregoing allegations of this Complaint.

98. Defendant JBN owed Plaintiff a duty to conform to a certain standard of care by using competent appraisers.

99. Defendant JBN and Vaughan owed Plaintiff a duty to follow FHA Guidelines and federal regulations when appraising the Property.

100. Defendants JBN and Vaughan breached the statutory duty of care by using an inaccurate appraisal.

101. Defendant JBN further breached the statutory duty of care by selling a toxic loan to Defendant RMF.

102. Plaintiff incurred actual loss or damage resulting from the conduct or failure to act of the Defendant JBN and Vaughan.

103. Plaintiff's damages resulted from the Defendants' breaches of their duties.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor, against Defendants JBN and Vaughan for actual damages, compensatory damages, and punitive damages in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00) and grant Plaintiff such other relief as the Court deems proper.

**COUNT THREE**
**VIOLATIONS OF THE MD. MORTGAGE FRAUD PROTECTION ACT**
**Md. Code Ann., Real Prop. § 7-401, _et seq._**
**(AGAINST DEFENDANTS JBN AND RMF)**

104.   The Plaintiff incorporates by reference the foregoing allegations of this Complaint.

105.   Plaintiff and Defendants engaged in the "mortgage lending process" as the term is defined by Md. Code Ann., Real Prop. ("MMFPA") § 7-401(e)(1).

106.   Plaintiff was a party to the mortgage lending process.

107.   Defendants committed "mortgage fraud" as the term is defined by MMFPA, § 7-401(d)(1) by knowingly making any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender and a party to the mortgage lending process.

108.   Defendants committed "mortgage fraud," as the term is defined by MMFPA, § 7-401(d)(2) by knowingly creating or producing a document for use during the mortgage lending process that contains a deliberate misstatement, misrepresentation, or omission with the intent that the document containing the misstatement, misrepresentation, or omission be relied on by a mortgage lender and a party to the mortgage lending process.

109.   Defendants committed "mortgage fraud," as the term is defined by MMFPA, § 7-401(d)(3) by knowingly using or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending

19

process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender and a party to the mortgage lending process.

110.   Defendants violated MMFPA § 7-402 by committing mortgage fraud.

111.   Defendants engaged in a pattern of mortgage fraud that involved the transfer of multiple Maryland properties. MMFPA, § 7-401(g).

112.   Under MMFPA, § 7-406, Plaintiff may recover compensatory damages, treble damages, and attorney's fees.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor, against Defendants JBN and RMF for actual damages, compensatory damages, treble damages, and punitive damages in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00) and grant Plaintiff such other relief as the Court deems proper.

## COUNT FOUR
### VIOLATION OF THE MD. CONSUMER DEBT COLLECTION ACT
### Md. Code Ann., Com. Law § 14-201, *et seq.*
### (AGAINST DEFENDANTS JBN AND RMF)

113.   The Plaintiff incorporates by reference the foregoing allegations of this Complaint.

114.   Ms. Ray is a "Person" as that term is defined in the MCDCA § 14-201(d).

115.   Defendants JBN and RMF are "Collectors" as that term is defined in the MCDCA § 14-201(b).

20

116.    The MCDCA states as follows: "In collecting or attempting to collect an alleged debt a collector may not [...] (8) Claim, attempt, or threaten to enforce a right with knowledge that the right does not exist."

117.    The Defendants violated MCDCA § 14-202(8), because they did "claim, attempt, or threaten to enforce a right with knowledge that the right does not exist."

118.    Pursuant to § 14-203, a collector in violation of the MCDCA is liable for any damages proximately caused by the violation, including damages for emotional distress or mental anguish suffered with or without accompanying physical injury.

119.    As a direct and proximate result of the Defendant's wrongful conduct, the Defendant caused the Plaintiff to suffer economic and noneconomic damages, injury, harm and loss.  The specific harms include but not limited to: loss of money, hospitalizations, loss of sleep, anxiety, humiliation, embarrassment, inconvenience and physical manifestations.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor, against Defendants JBN and RMF for actual damages and compensatory damages in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00) and grant Plaintiff such other relief as the Court deems proper.

21

## **CLAIM FOR ATTORNEY'S FEES ALLOWED BY LAW**

120.   Pursuant to Rule 2-703(b) the Plaintiff includes this separately numbered claim for attorney's fees in this initial pleading.   Further, pursuant to Rule 2-703(d), the Plaintiff advises the Court and the Defendants that she believes that this case is likely to result in a substantial claim for attorneys' fees for services over a significant period of time.

DATED: APRIL 23, 2021                          Respectfully Submitted,

/s/ Kathleen Hyland
Kathleen P. Hyland, Esq.
CPF # 1206200116
HYLAND LAW FIRM, LLC
222 Severn Avenue, Suite 17
Annapolis, MD 21403
(410) 777-5396 (Tel.)
(410) 777-8237 (Fax)
kat@lawhyland.com

*Attorney for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff respectfully requests a jury trial for all claims that may be heard by a jury.

/s/Kathleen Hyland
Kathleen P. Hyland, Esq.
CPF # 1206200116
HYLAND LAW FIRM, LLC
222 Severn Avenue, Suite 17
Annapolis, MD 21403
(410) 777-5396 (Tel.)
(410) 777-8237 (Fax)
kat@lawhyland.com

*Attorney for Plaintiff*

23

# Exhibit A

20/20 Valuations, LLC

## Uniform Residential Appraisal Report

2418786762 / 90398
File No. 2017710

There are __16__ comparable properties currently offered for sale in the subject neighborhood ranging in price from $ __27,000__ to $ __138,500__

There are __28__ comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ __14,800__ to $ __125,000__

| FEATURE | SUBJECT | COMPARABLE SALE NO. 1 | +(-) $ Adjustment | COMPARABLE SALE NO. 2 | +(-) $ Adjustment | COMPARABLE SALE NO. 3 | +(-) $ Adjustment |
|---|---|---|---|---|---|---|---|
| Address | 29 N Monastery Ave  Baltimore, MD 21229 | 134 Siegwart Ln  Baltimore, MD 21229 | | 56 Culver St S  Baltimore, MD 21229 | | 120 Loudon Ave S  Baltimore, MD 21229 | |
| Proximity to Subject | | 0.23 miles SE | | 0.12 miles SW | | 0.33 miles SW | |
| Sale Price | $ | $ 25,000 | | $ 30,000 | | $ 36,000 | |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 26.60 sq. ft. | | $ 27.78 sq. ft. | | $ 30.77 sq. ft. | |
| Data Source(s) | | MRIS#BA9810938;DOM 286 | | MRIS#BA9816213;DOM 69 | | MRIS#BA9813484;DOM 68 | |
| Verification Source(s) | | MRIS, Tax Records | | MRIS, Tax Records | | MRIS, Tax Records | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing Concessions | | ArmLth  Cash;0 | | ArmLth  Cash;0 | | ArmLth  Cash;0 | |
| Date of Sale/Time | | s09/17;c08/17 | | s02/17;c02/17 | | s02/17;c01/17 | |
| Location | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Leasehold/Fee Simple | Fee Simple | Leasehold | 0 | Leasehold | 0 | Fee Simple | |
| Site | 1672 sf | 1335 sf | 0 | 1540 sf | 0 | 1040 sf | 0 |
| View | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Design (Style) | AT2;IOG | AT2;IOG | | AT2;EOG | -500 | AT2;IOG | |
| Quality of Construction | Q4 | Q4 | | Q4 | | Q4 | |
| Actual Age | 87 | 75 | 0 | 102 | 0 | 117 | 0 |
| Condition | C4 | C4 | | C4 | | C4 | |
| Above Grade | Total Bdrms Baths | Total Bdrms Baths | -3,000 | Total Bdrms Baths | | Total Bdrms Baths | |
| Room Count | 6  2  1.0 | 5  2  1.0 | 0 | 6  3  1.0 | 0 | 5  2  1.0 | 0 |
| Gross Living Area | 1,140 sq. ft. | 940 sq. ft. | 4,000 | 1,080 sq. ft. | 0 | 1,170 sq. ft. | 0 |
| Basement & Finished Rooms Below Grade | 390sf0sfwo | 420sf0sfwu | 0 | 540sf0sfwu | 0 | 585sf0sfin | 0 |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Rad, No CAC | Rad, No CAC | | Rad, No CAC | | FWA, CAC | -2,000 |
| Energy Efficient Items | None | None | | None | | None | |
| Garage/Carport | 1gbi1dw | None | 2,000 | None | 2,000 | None | 2,000 |
| Porch/Patio/Deck | 2 Porches | Porch | 2,000 | Porch | 2,000 | None | 3,500 |
| Fireplace | None | None | | 1 Fpl | -500 | None | |
| Net Adjustment (Total) | | [X] +  [ ] -  $ 8,000 | | [X] +  [ ] -  $ 0 | | [X] +  [ ] -  $ 3,500 | |
| Adjusted Sale Price of Comparables | | Net Adj. 32.0%  Gross Adj. 32.0% $ 33,000 | | Net Adj. 0.0%  Gross Adj. 26.7% $ 30,000 | | Net Adj. 9.7%  Gross Adj. 20.8% $ 39,500 | |

I [X] did [ ] did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research [ ] did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data source(s)   MRIS, Tax Rcds
My research [ ] did [X] did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data source(s)   MRIS, Tax Rcds
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE NO. 1 | COMPARABLE SALE NO. 2 | COMPARABLE SALE NO. 3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | MRIS, Tax Rcds | MRIS, Tax Rcds | MRIS, Tax Rcds | MRIS, Tax Rcds |
| Effective Date of Data Source(s) | 11/07/2017 | 12/11/2017 | 11/06/2017 | 11/07/2017 |

Analysis of prior sale or transfer history of the subject property and comparable sales   It is assumed that there have been no transfers of the subject or comps between the time of the last update of the public record and effective date of this appraisal, outside of what has been reported above. There can be some lag time between a date of sale and recording of the transfer in the public record.

Summary of Sales Comparison Approach:   See Attached Addendum

Indicated Value by Sales Comparison Approach $   33,000

Indicated Value by: Sales Comparison Approach $ 33,000   Cost Approach (if developed) $ 0   Income Approach (if developed) $ 0

The Cost Approach & Income Approaches were not used. Due to sufficient resale activity in the subject neighborhood over the prior 12 months the Sales Comparison Approach is the most reliable approach to value. This is a Appraisal Report.

This appraisal is made [X] "as is", [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, [ ] subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or [ ] subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $   33,000
, which is the date of inspection and the effective date of this appraisal.
as of   12/08/2017

20/20 Valuations

# EXHIBIT B

## CONTRACT FOR THE SALE AND PURCHASE OF REAL ESTATE
### (NO BROKER)

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Gwendolyn Ray and Phyllis Ray, "Sellers" and, Kevin Ennals "Buyer", do hereby covenant, contract and agree as follows:

1.    AGREEMENT TO SALE AND PURCHASE: Sellers agree to sell and Buyer agrees to buy from Sellers the property known as 29 N Monastery Avenue, Baltimore, MD 21229, hereinafter called the "Property".

2.    SALES PRICE:  The parties agree to a sales price of $31,350.00.

FINANCING: The following provisions apply with respect to financing:
This contract is not contingent on the Buyer obtaining financing

3. PROPERTY CONDITION:  **THIS PROPERTY IS BEING SOLD "AS IS'.**

PROPERTY DISCLOSURE/DISCLAIMER:    Section 10-702 of the Real Property Article, *Annotated Code of Maryland*, requires the owner of certain residential real property to furnish to the purchaser either (a) a RESIDENTIAL PROPERTY DISCLAIMER STATEMENT stating that the owner is selling the property "as is" and makes no representations or warranties as to the condition of the property or any improvements on the real property, except as otherwise provided in the contract of sale, or (b) a RESIDENTIAL PROPERTY DISCLOSURE STATEMENT disclosing defects or other information about the condition of the real property actually known by the owner. Seller has furnished, and Buyer has received and reviewed, a RESIDENTIAL PROPERTY DISCLAIMER STATEMENT.

SELLER'S DISCLOSURE OF LEAD-BASED PAINT AND LEAD-BASED PAINT HAZARDS is required by Federal law for residential dwelling construction prior to 1978. An addendum providing such disclosure is attached.
          If the subject residential dwelling was constructed prior to 1978, Buyer may conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards, to be completed within 10___days after execution of this agreement. In the alternative, Buyer may waive the opportunity to conduct an assessment/ inspection by indicating said waiver on the attached Lead-Based Paint Disclosure form.

INSPECTIONS: Seller agrees to provide access to the Buyer's representatives prior to closing for inspection of the Property. Any inspection of the property must be completed within two weeks after the effective date of the contract.

ACCEPTANCE: This contract will become a binding contract when accepted by the Seller and signed by both Buyer and Seller.

## CONTRACT FOR THE SALE AND PURCHASE OF REAL ESTATE
### (NO BROKER)

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Gwendolyn Ray and Phyllis Ray, "Sellers" and, Kevin Ennals "Buyer", do hereby covenant, contract and agree as follows:

1.    AGREEMENT TO SALE AND PURCHASE: Sellers agree to sell and Buyer agrees to buy from Sellers the property known as 29 N Monastery Avenue, Baltimore, MD 21229, hereinafter called the "Property".

2.    SALES PRICE:  The parties agree to a sales price of $31,350.00.

FINANCING: The following provisions apply with respect to financing:
This contract is not contingent on the Buyer obtaining financing

3. PROPERTY CONDITION:  **THIS PROPERTY IS BEING SOLD "AS IS'.**

PROPERTY DISCLOSURE/DISCLAIMER:    Section 10-702 of the Real Property Article, *Annotated Code of Maryland*, requires the owner of certain residential real property to furnish to the purchaser either (a) a RESIDENTIAL PROPERTY DISCLAIMER STATEMENT stating that the owner is selling the property "as is" and makes no representations or warranties as to the condition of the property or any improvements on the real property, except as otherwise provided in the contract of sale, or (b) a RESIDENTIAL PROPERTY DISCLOSURE STATEMENT disclosing defects or other information about the condition of the real property actually known by the owner. Seller has furnished, and Buyer has received and reviewed, a RESIDENTIAL PROPERTY DISCLAIMER STATEMENT.

SELLER'S DISCLOSURE OF LEAD-BASED PAINT AND LEAD-BASED PAINT HAZARDS is required by Federal law for residential dwelling construction prior to 1978. An addendum providing such disclosure is attached.
       If the subject residential dwelling was constructed prior to 1978, Buyer may conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards, to be completed within 10___days after execution of this agreement. In the alternative, Buyer may waive the opportunity to conduct an assessment/ inspection by indicating said waiver on the attached Lead-Based Paint Disclosure form.

INSPECTIONS: Seller agrees to provide access to the Buyer's representatives prior to closing for inspection of the Property. Any inspection of the property must be completed within two weeks after the effective date of the contract.

ACCEPTANCE: This contract will become a binding contract when accepted by the Seller and signed by both Buyer and Seller.

DEPOSIT: Upon acceptance, Buyer will place in escrow an earnest money deposit of ___N/A_____ with a title company which will be part of the cash paid to the seller when title transfers.

4.   CLOSING: The closing of the sale will be on or before **April 25, 2018**, unless extended by agreement of the parties.

5.   DEED AND TITLE: Upon payment of the purchase price, a deed for the Property containing covenants of special warranty and further assurances shall be executed by Seller and shall convey the Property to Buyer. Title to the Property, including all chattels including in the purchase, shall be good and merchantable, free of liens and encumbrances except as specified herein, except for use and occupancy restrictions of public record which are generally applicable to properties in the immediate neighborhood or the subdivision in which the Property is located and publicly recorded easement for public utilities and all other easements which may be observed by an inspection of the Property. Buyer expressly assumes the risk that restrictive covenants, zoning laws or other recorded documents may restrict or prohibit the use of the Property for the purposes intended by Buyer. In the event Seller is unable to give good and merchantable title or such as can be insured by a Maryland licensed title insurer, with Buyer paying not more than the standard rate as filed with the Maryland Insurance Commissioner, Seller at Seller's expense, shall have the option of curing any defect so as to enable Seller to give good and merchantable title or, if Buyer is willing to accept title without said defect being cured, paying any special premium on behalf of the Buyer to obtain title insurance on the Property to the benefit of Buyer. In the event Seller elects to cure any defects in the title, this Contract shall continue to remain in effect; and the date of settlement shall be extended for a period not to exceed fourteen (14) additional days. If Seller is unable to cure such title defects and is unable to obtain a policy of title insurance on the property on the Property to the benefit of Buyer, from Maryland licensed title insurer, Buyer shall have the option of taking such title as Seller can give, or terminating this Contract, and being reimbursed by the Seller for cost of searching title as may have been incurred not to exceed ½ of 1% of the purchase price. In the latter event, there shall be no further liability or obligation on either of the parties hereto, and this contract shall became null and void and all deposits hereunder shall be returned to Buyer in accordance with the terms of this Contract.

APPRAISAL, SURVEY AND TERMITE INSPECTION: Any appraisal of the property, termite inspection or survey shall be the responsibility of Buyer and at Buyer's expense.

6.   POSSESSION AND TITLE: Seller shall deliver possession of the Property to Buyer at closing. Title shall be conveyed to Buyer at closing. Prior to closing the property shall remain in the possession of Seller and Seller shall deliver the property to Buyer in substantially the same condition at closing, as on the date of this contract, reasonable wear and tear excepted.

7.   CLOSING COSTS AND EXPENSES: All Closing costs including recording fees, recordation and transfer taxes shall be paid by Buyer.

PRORATIONS: Real Estate (Property) taxes for the current year, interest, maintenance fees, assessment, dues and rents, if any, will be prorated through the Closing Date.

8.    CASUALTY LOSS: If any part of the Property is damaged or destroyed by fire or other casualty loss after the effective date of the contract, the Seller shall promptly refund the Buyer's earnest money deposit and the Buyer hereby assigns, without further acknowledgement, to the Seller all of the Buyer's interest in the proceeds of any insurance covering the damage or destruction. Upon such fire or casualty, this contract shall terminate as to the "Property" and the parties hereto shall be released from all further liability hereunder, at law and in equity. The Seller shall promptly notify the Buyer of any damage to or destruction of the "Property".

9.    DEFAULT: Buyer and Seller are required and agree to make full settlement in accordance with the terms of this Contract and acknowledge that failure to do so constitutes a breach hereof. If Buyer fails to make full settlement, or is in default due to Buyer's failure to comply with the Contract, the deposit may be retained by the Seller as liquidated damages. If Seller fails to make full settlement or is in default due to Seller's failure to comply with the contract (with the exception of title problems, covered in section 7, above), Buyer shall be entitled to a full refund of the deposit in full settlement of Buyer's claims.

10.   AGREEMENT OF PARTIES: This contract contains the entire agreement of the parties and cannot be changed except by their written agreement.

11.   NOTICES: All notices from one party to the other must be in writing and are effective when mailed to, hand delivered at, or transmitted by facsimile machine as follows:

To Buyers at:                          To Seller at:
1431 N. Linwood Avenue                 29 N Monastery Avenue
Baltimore, MD 21213                    Balt., MD 21229
Telephone _____             Telephone _____
Facsimile _____             Facsimile _____

12.   ASSIGNMENT: This Agreement may not be assigned by Buyer without the consent of Seller. This agreement may be assigned by Seller and shall be binding on the heirs and assigns of the parties hereto.

13.   PRIOR AGREEMENTS: This contract incorporates all prior agreements between the parties, contains the entire and final agreement of the parties, and cannot be changed except by their written consent.

Neither party has relied upon any statement or representation made by the other party or any sales representative bringing the parties together. Neither party shall be bound by any terms, conditions, oral statements, warranties, or representations not herein contained. Each party acknowledges that he has read and understands this contract. The provisions of this contract shall apply to and bind the heirs, executors, administrators, successors and assigns of the respective parties hereto. When herein used, the singular includes the plural and the masculine includes the feminine as the context may require.

14.    NO BROKER OR AGENT: The parties represent that neither party has employed the serviced of a real estate broker or agent in connection with the property, or that if such agents have been employed, that the party employing said agent shall pay any and all expenses outside the closing of this agreement.

15.    EMINENT DOMAIN: If the property is condemned by eminent domain after the effective date hereof, the Seller and Buyer shall agree to cancel the Contract

16.    TIME IS OF THE ESSENCE IN THE PERFORMANCE OF THIS AGREEMENT.

17.    GOVERNING LAW: This contract shall be governed by the laws of the State of Maryland.

EXECUTED the __5th__ day of April, 2018_____ (THE EFFECTIVE DATE).


_Kevin Ennals_                                         _Gwendolyn Ray_
Buyer: Kevin Ennals                                   Seller:  Gwendolyn Ray

                                                      _Phyllis Ray_
                                                      Seller: Phyllis Ray

# Lead-Based Paint Disclosure

## Address

Disclosure of information on Lead-Based Paint and/or Lead-Based Paint Hazards

## Lead Warning Statement

Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The Seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the Seller's possession and notify the buyer of any known lead-based hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

**Seller's Disclosure**

(a)Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):

    (i)_____Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

    _____

    (ii)__✓__Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b)Records and reports available to the seller (check (i) or (ii) below:

    (i)_____Seller has provided the purchaser with all available records and reports pertaining to lead-based   paint and/or lead-based   paint hazards in the housing (list of documents).

    _____

    (ii)__✓__Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's Acknowledgement (initial)**

(c)_____Purchaser has received copies of all information listed above.

(d)__✓__Purchaser has received the pamphlet "Protect Your Family from Lead in Your Home"

(e)Purchaser has (check (i) or (ii) below):

    (i)_____received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

    (ii)__✓__waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

Seller Initials: __KB__          Buyers Initials: __MR__  __P.R.__

**Certificate of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate. Penalties for failure to comply with Federal Lead-Based Paint Disclosure Laws include treble (3times) damages, attorney fees, costs, and a penalty up to $10,000 for each violation.

Buyer: Kevin Ennals

Seller: Gwendolyn Ray

Seller: Phyllis Ray

MARYLAND RESIDENTIAL PROPERTY DISCLAIMER STATEMENT

Property Address: 9 N Mnastery Avenue, Baltimore, MD 21229

The undersigned owner(s) of the above listed real property make no representations or warranties as to the condition of the real property or any improvements thereon, and the purchaser will be receiving the real property "as is" with all defects, including latent defects, which may exist, except as otherwise provided in the real estate contract of sale. The owner(s) acknowledge having carefully examined this statement and further acknowledge that they have been informed of their rights and obligations under §10-702 of the Maryland Real Property Article.

The owner(s) acknowledge that there are no known latent defects.

Owner _Gwendolyn Ray_____   Date _04-05-18_
Gwendolyn Ray

Owner _Phyllis Ray_____   Date _04-05-18_
Phyllis Ray

The purchaser(s) acknowledge receipt of a copy of this disclaimer statement and further acknowledge that they have been informed of their rights and obligations under §10-702 of the Maryland Real Property Article.

Purchaser_ _Kevin Ennals_____   Date _4-5-2018_
Kevin Ennals

Maryland Residential Property Disclaimer Statement

# Exhibit C

## Uniform Residential Appraisal Report

2018110
File # 90398

| There are | 6 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 50,000 | | to $ 89,900 |

| There are | 15 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 40,000 | | to $ 80,000 |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 29 N Monastery Ave | 107 Hilton St | | 305 Gwynn Ave | | 144 S Culver St | |
| | Baltimore, MD 21229 | Baltimore, MD 21229 | | Baltimore, MD 21229 | | Baltimore, MD 21229 | |
| Proximity to Subject | | 0.27 miles E | | 0.35 miles NE | | 0.20 miles SW | |
| Sale Price | $ | | $ 59,000 | | $ 75,000 | | $ 55,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 39.18 sq.ft. | | $ 58.23 sq.ft. | | $ 46.77 sq.ft. | |
| Data Source(s) | ☒ | MRIS/BA10166343;DOM 0 | | MRIS/BA9644492;DOM 33 | | MRIS/BA10030754;DOM 9 | |
| Verification Source(s) | | MRIS/Tax Records | | MRIS/Tax Records | | MRIS/Tax Records | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | ArmLth | | ArmLth | | ArmLth | |
| Concessions | | VA;2950 | | FHA;1800 | | Conv;1650 | |
| Date of Sale/Time | | s04/18;c02/18 | | s11/17;c08/17 | | s10/17;c08/17 | |
| Location | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Leasehold/Fee Simple | Fee Simple | 90GR@6% | +1,500 | Fee Simple | 0 | 96GR@6% | +1,600 |
| Site | 1672 sf | 1890 sf | 0 | 1260 sf | 0 | 1540 sf | 0 |
| View | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Design (Style) | AT2;GROUP | AT2;GROUP | | AT2;GROUP | | AT2;GROUP | |
| Quality of Construction | Q4 | Q4 | | Q4 | | Q4 | |
| Actual Age | 88 | 97 | 0 | 98 | 0 | 94 | 0 |
| Condition | C3 | C3 | | C3 | | C3 | |
| Above Grade | Total | Bdrms. | Baths | Total | Bdrms. | Baths | Total | Bdrms. | Baths | | Total | Bdrms. | Baths | |
| Room Count | 6 | 3 | 1.0 | 7 | 4 | 1.0 | ☒ | 6 | 3 | 1.0 | 0 | 6 | 3 | 1.0 | ☒ | 6 | 3 | 1.0 | ☒ |
| Gross Living Area | 1,140 sq.ft. | 1,506 sq.ft. | -3,700 | 1,288 sq.ft. | -1,500 | 1,176 sq.ft. | 0 |
| Basement & Finished | 510sf0sfwo | 693sf365sfin | 0 | 644sf322sfwo | 0 | 588sf0sfin | 0 |
| Rooms Below Grade | | 1rr0br0.1ba0c. | +5,000 | 1rr0br0.0ba0o. | -3,000 | | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | GHWANONE | GHWBB/CAC | -1,500 | GHS/CAC | -1,500 | OHW/NONE | 0 |
| Energy Efficient Items | REPLACE WID. | REPLACE WID. | | REPLACE WID. | | REPLACE WID. | |
| Garage/Carport | 1gbl1dw | None | +2,000 | None | +2,000 | None | +2,000 |
| Porch/Patio/Deck | PORCHES | PORCH | +500 | PORCH,DECK | -1,500 | PORCH | +500 |
| Fireplace | NONE | NONE | | NONE | | NONE | |
| MISC AMENITIES | FENCE | FENCE | | FENCE | | FENCE | |
| MISC AMENITIES | NONE | NONE | | MOD KIT & BA | -5,000 | NONE | |
| Net Adjustment (Total) | | ☒ + ☐ - | $ 3,800 | ☐ + ☒ - | $ -10,500 | ☒ + ☐ - | $ 4,100 |
| Adjusted Sale Price | | Net Adj. 6.4 % | | Net Adj. 14.0 % | | Net Adj. 7.5 % | |
| of Comparables | | Gross Adj. 24.1 % | $ 62,800 | Gross Adj. 19.3 % | $ 64,500 | Gross Adj. 7.5 % | $ 59,100 |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.

Data Source(s) MRIS/PUBLIC RECORD

My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.

Data Source(s) MRIS/PUBLIC RECORD.

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 02/28/2018 | | | |
| Price of Prior Sale/Transfer | $0 | | | |
| Data Source(s) | MRIS/PR | MRIS/PR. | MRIS/PR. | MRIS/PR. |
| Effective Date of Data Source(s) | 04/10/2018 | 03/07/2018 | 03/07/2018 | 04/09/2018 |

Analysis of prior sale or transfer history of the subject property and comparable sales   ALL PRIOR SALES/TRANFERS  FOR THE SUBJECT PROPERTY
FOR THE PAST 3 YEARS  AND PAST 1 YEAR FOR THE COMPS HAVE BEEN NOTED. IF ANY, IT APPEARS THAT THE PROPERTY WAS
TRASNFERED WITH NO CONSIDERATION.

Summary of Sales Comparison Approach   ALL THE COMPARABLES ARE SIMILAR IN DESIGN, QUALITY OF CONSTRUCTION, AND LOCATED
IN CLOSE PROXIMITY. REFLECTIVE OF PRICES PAID FOR SIMILAR PROPERTIES AND ARE GIVEN EQUAL WEIGHT IN THE FINAL
ESTIMATE OF VALUE. DUE TO LIMITED COMPARABLES SALES, COMP 3 IS OVER SIX MONTHS OLD, HOWEVER IT IS STILL
CONSIDERED TO BE A GOOD INDICATOR OF VALUE FOR THE MARKET AREA.   THE COMPARABLES SELECTED WERE CONSIDERED
AMONGING THE BEST IN TERMS OF BRACKETING THE SUBJECT AMENITIES, THE FINAL ESTIMATE OF VALUE IS BRACKETED BY BOTH
THE ADJUSTED AND UNADJUSTED RANGE OF VALUE.

Indicated Value by Sales Comparison Approach $ 60,000

| Indicated Value by: Sales Comparison Approach $ 60,000 | Cost Approach (if developed) $ | Income Approach (if developed) $ |
|---|---|---|

THE COST APPROACH WAS  NOT DEVELOPED.  INCOME APPROACH NOT APPLICABLE AS THE PROPERTY LENDS ITSELF TO OWNER
OCCUPANCY, THE MARKET APPROACH HEAVILY RELIED UPON AS IT IS THE BASIS OF VALUE ACCEPTABLE BY BUYERS & SELLERS.

This appraisal is made ☒ "as is",  ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been
completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the
following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: NO WARRANTY IS EXPRESSED,
OR IMPLIED AND NO LIABILITY ASSUMED FOR THE STRUCTURAL OR OTHER SYSTEMS OF THE PROPERTY.

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting
conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is
$ 60,000 , as of 04/23/2018 , which is the date of inspection and the effective date of this appraisal.

## Uniform Residential Appraisal Report

2018110
File # 90398

| ADDITIONAL COMMENTS | |
|---|---|
| A REASONABLE EXPOSURE TIME FOR THE SUBJECT PROPERTY IS 30-180 DAYS | |
| UNLESS OTHERWISE NOTED, I HAVE PERFORMED NO SERVICES, AS AN APPRAISER OR IN ANY CAPACITY, REGARDING THE PROPERTY THAT IS THE SUBJECT OF THIS REPORT WITHIN THE THREE-YEAR PERIOD IMMEDIATELY PRECEDING ACCEPTANCE OF THIS ASSIGNMENT. | |
| THE PROPERTY WAS APPRAISED PER HUD STANDARDS. | |
| THE SUBJECT PROPERTY MEETS ALL FHA/HUD MINIMUM GUIDELINES AS OUTLINED BY HANDBOOK 4000.1 AND ALL APPLICABLE MORTGAGE LETTERS. | |
| THE INTENDED USER OF THIS APPRAISAL REPORT IS THE LENDER/CLIENT AND HUD/FHA | |
| IT IS NOT UNCOMMON FOR THE SITE VALUE TO EXCEED 30%+ OF THE FINAL ESTIMATE OF VALUE. | |
| NO ADJUSTMENT MADE FOR CONCESSIONS AS THEY ARE CONSIDERED CUSTOMARY AND REASONABLE FOR THE MARKET AREA. | |
| AT THE TIME OF INSPECTION ALL UTILTIES WERE ON & OPERATING. | |

### COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.
Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)

| COST APPROACH | | |
|---|---|---|
| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE | =$ |
| Source of cost data | DWELLING    Sq.Ft. @ $ | =$ |
| Quality rating from cost service    Effective date of cost data | Sq.Ft. @ $ | =$ |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | =$ |
| COST APPROACH NOT DEVELOPED | Garage/Carport    Sq.Ft. @ $ | =$ |
| | Total Estimate of Cost-New | =$ |
| | Less   Physical   Functional   External | |
| | Depreciation | =$( ) |
| | Depreciated Cost of Improvements | =$ |
| | "As-is" Value of Site Improvements | =$ |
| Estimated Remaining Economic Life (HUD and VA only)   30   Years | INDICATED VALUE BY COST APPROACH | =$ |

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

| INCOME | | |
|---|---|---|
| Estimated Monthly Market Rent $   X Gross Rent Multiplier   =$ | | Indicated Value by Income Approach |
| Summary of Income Approach (including support for market rent and GRM) | | |

### PROJECT INFORMATION FOR PUDs (if applicable)

| PUD INFORMATION |
|---|
| Is the developer/builder in control of the Homeowners' Association (HOA)?  ☐ Yes  ☐ No   Unit type(s)  ☐ Detached  ☐ Attached |
| Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit. |
| Legal Name of Project |
| Total number of phases    Total number of units    Total number of units sold |
| Total number of units rented    Total number of units for sale    Data source(s) |
| Was the project created by the conversion of existing building(s) into a PUD?  ☐ Yes  ☐ No  If Yes, date of conversion. |
| Does the project contain any multi-dwelling units?  ☐ Yes  ☐ No  Data Source |
| Are the units, common elements, and recreation facilities complete?  ☐ Yes  ☐ No  If No, describe the status of completion. |
| Are the common elements leased to or by the Homeowners' Association?  ☐ Yes  ☐ No  If Yes, describe the rental terms and options. |
| Describe common elements and recreational facilities. |

Freddie Mac Form 70 March 2005          UAD Version 9/2011   Page 3 of 6          Fannie Mae Form 1004 March 2005